Your Honor, I am Gene Goldsmith, the attorney for Appellant Jill Garcia, and I'd like to reserve three minutes of my time for rebuttal. This is an employment discrimination case brought by Ms. Garcia against Allstate Insurance Company, and I think in this area the law is fairly well settled, and what I want to do is review the facts applicable to this situation and why we believe there are material facts sufficient to preclude summary judgment. In the, I was left after reading your brief with only sort of one serious question in my mind, and that has to do with whether Smith was a decision maker, what evidence there is. Just for purposes of summary judgment, I'm speaking for myself alone, it appears that there's evidence that Smith had issues that might preclude summary judgment. Were he the decision maker, but I'm not certain what evidence there is in the record that he was a decision maker. That was actually the first thing I was going to address, because I think you're right. And I want to start with, you know, the standard from the Mottoyer case from this jurisdiction, that where the person who exhibited discriminatory animus influenced or participated in the decision-making process, a reasonable fact finder could conclude that the animus affected the employment decision. And I think there's both direct and circumstantial evidence that Mr. Smith was involved in the decision-making. And I want to start with the testimony of Jill Garcia, excuse me, and the comments made to her by her boss, Pat Meldrum, who's at the same level as Mr. Smith and, you know, is also in management at Allstate. And this is at page 41 of our excerpts. And this is what she, what he said to Mr. Garcia. And this is, by the way, evidence that was not contested by Allstate or objected to by Allstate in the summary judgment process. This is Jill Garcia again talking about what Mr. Meldrum told her. He told me specifically that he had not heard anything, that they wouldn't tell him anything. That's about the investigation into her. But that if I came through this without losing my job and I will directly quote him, that I need to show Tom Smith I can be one of the boys because Tom Smith will determine whether I keep my job or not. And this is directly from a management employee at Allstate. Were they talking there about the fact that she was looking in the future to be moved into his department and then that's it? Well, I think, you know, again, we're at the summary judgment stage and you can interpret it various ways. I would interpret that to say that, yes, she was going to be working under him and it was going to be Smith's decision whether or not she kept her job, not just in the future, but as part of this process. And I think that is direct evidence of his participation in this process. And we know from the Godwin case that an agent within the scope of his or her employment, those statements are admissible. Again, this was not objected to by Allstate and it is direct evidence of his animus. I think there's also sufficient – there's substantial circumstantial evidence to bolster that. And I think the starting point is Allstate's – it seems the other crux of their argument, one is, as you mentioned, you know, was Mr. Smith involved in the decision? The second is, why didn't Jill Garcia go back and talk to Mr. Smith? Well, and it seems  for justifying the firing is she should have gone and talked to Smith, not her supervisor, even though Smith is not the supervisor and allegedly not part of the decision. She did tell her supervisor, Mr. Meldrum, she told corporate security. So if Mr. Smith is not involved in the decision, why is it so important that she go talk to him as opposed to all the other people that she did in fact go speak to? There's a strong inference from that that he's somebody that was important to the process and had to be told, even though she went to others with the exact same information they claim she didn't go to with – to Mr. Smith. Mr. Smith made the initial call to her. He's the person who instigated this process. Again, there's an inference from that that he was part of the decision-making process. And again, as you mentioned, he was about to be her boss. Again, I think the inference from that is he was part of the process of deciding whether or not to terminate her. I think if you combine that along with the direct evidence from Mr. Meldrum, with Smith's history, which you alluded to, there's a reasonable inference that he was, if not the one making the decision, at least influential in making that decision. Counsel, did you submit any evidence as to a different treatment of males who possibly had conflicts of interest, whether they were terminated or not? Well, I can't say we specifically have that. I will tell you what I think the record does have in that regard. We have the testimony of Mr. Smith that 99% of the time when corporate security clears somebody of wrongdoing, as was the case with Ms. Smith, that person's not fired. So people who did wrongdoing – I mean, who did no wrong, who were not guilty of wrongdoing, were not fired except for Ms. Smith. There was also – and it didn't have to do with – You mean Ms. Garcia, I think. Yeah, I'm sorry. I apologize. Ms. Garcia. I should keep the name straight after reading the files so many times. I apologize for that. There's also evidence in the file that a male supervisor who was guilty of sexual harassment was transferred instead of fired. He didn't lose his job. And then, in fact, when he did it a second time, he was allowed to resign as opposed to be discharged by Ms. Smith, which, again, I think is a different kind of treatment. And I realize it's not on the conflict of interest specifically. But, again, the history of the company is that if somebody is exonerated by corporate security, they are not fired. And that's not what happened to Ms. Smith. And I think that is – Garcia. Garcia. And if I keep saying it, I will keep apologizing. Ms. Garcia. That is an inconsistency in Allstate's theory of the case and the story of the case. And, again, the big justification that Allstate gives for discharging Ms. Garcia – and I will say her name correctly – is she didn't disclose what she learned after she was initially asked about her husband's possible involvement with an Allstate agent. But there's contrary evidence. She did tell her boss, Mr. Mildred, told him right away that following Monday – this happened on a Friday and she investigated over the weekend and told him on a Monday – she knew that Monday she was going to be under investigation. At the first opportunity when she spoke to him, she told the corporate investigator what she had found and what she had determined and why she determined, in fact, her husband did not own an interest in the Allstate dealership. And Garcia had a sense that Mr. Smith was out to fire her and out to get her, and she explained why it was not – he was not the person she was going to go to. Ms. Garcia also had no history of discipline, yet she gets fired in a circumstance where corporate security says there was no wrongdoing, not even enough for a reprimand or any other discipline, much less firing. And the corporate security recommendation is thorough, and it doesn't recommend discipline at any level. It says she received no benefit to her or her spouse from this loan to the – by her father-in-law – and actually her – at that point, not even her father-in-law, but her soon-to-be father-in-law to an agent. She had no knowledge of the details of that, and she or her husband had no share in the monies or the collateral. How significant is it that she had lost her securities accreditation, and as a – if we're weighing reasons why she might have been fired when others weren't? Well, the question is why and how, and we still don't know who it is that took away that security license. In other words, there is a security investigation that clears her, yet for some reason somebody sends that to the affiliate Allstate Financial. And by the way, there is evidence in the record that Allstate can direct Allstate Financial as to what to do. Why would somebody send that in the first place? If they had that information and it was sufficient to discharge Ms. Garcia, why not just let her go at that time? Instead, they send it to some unknown person at Allstate Financial. Some unknown person at Allstate Financial allegedly determines that they can't trust her and they have to take away her license. And in fact, that is the only reason given in the termination notice for her actual termination. Again, I think that explanation is unworthy of credence when you look at the circumstances and it can, I think, a reasonable trier of fact to disbelieve that that was the real reason. And it is, I think, under these circumstances, it's up to the trier of fact to determine that. Were there attempts at discovery on finding out just what was going on over at Allstate Financial? As far as I know, nothing beyond what you have in the record was produced on that issue, except that all we have is what I think is hearsay in the memorandums from Allstate that Allstate Financial no longer wanted her working with it. But again, there is evidence that Allstate could direct Allstate Financial on to what to do, but nothing beyond that. And also, why not provide her with a new or different job if it was just Allstate Financial's taking of the license that cost her this job? They have other jobs for which security licenses are not required. Again, why discharge her? There's also a lot of talk in the briefs and even in these memos about NASD or what we call now FINRA violations. I don't see any NASD violations, any rule that's been violated that's been cited to the court. In fact, I don't even see an Allstate rule that was violated when you really look at the rule by her. And again, I'm running short on time. I think there's more circumstantial evidence which is sufficient. There's also a lot of direct evidence, which you alluded to, that Mr. Smith essentially had an all-boys club in his territory. All of the nine managers were male. Two of the three assistants were female. It's very similar to the Godwin case, the kind of all-male floor or almost all-male 10th floor, the bowling event where he made fun of her having stag trips on the houseboat and the hunting trips and the fishing trips that were stag trips, comments about she needed to be one of the boys. And I think amongst all that, and again, I could go on, but I'm think there is sufficient direct evidence in this file and also circumstantial evidence that there's an issue of fact that ought to be presented to the jury and summary judgment should be reversed. Thank you. We have some rebuttal time still when the time counts. We'll hear from Mr. Paley. Good morning, Your Honors. Andrew Paley on behalf of Allstate. I think Your Honors hit upon the key question, and I just want to address that directly, which is that there is no evidence whatsoever that Mr. Smith was involved in any way in the decision to either issue the U-5, which is the termination of affiliation with the broker-dealer Allstate Financial, the license, or the termination of Ms. Garcia's employment with Allstate itself. Why was Smith the one who called her? Very simply, and what the record reflects, Your Honor, is because Mr. Cardinal, his boss, picked up the phone and said, could you call her. That is the very simple answer to that question, because his boss said, could you ask her. That was his only involvement, period, full stop. He asked her a question. And, in fact, Mr. Smith knew nothing about the Adler agency issue. And what he was asked by Mr. Cardinal was, ask her if there's any interest in an agency. If there was, I'm sorry. If she or her husband has an interest in an agency that she supervises. Mr. Smith knew nothing about the Adler agency. Mr. Smith was not her supervisor. That, other than reporting back to Mr. Cardinal saying she said, no, there's nothing, that is it. That is the sum total of Mr. Smith's involvement in the chronology. Here's my issue with your side of the case. In terms of evidence of pretext, which is what we're talking about, whether there's enough evidence of your side of the case, is the testimony that 99% of the time, Allstate follows the recommendation of the investigating person or body. And in this case, the investigators did not recommend any discipline. So what is it that put this person in the 1% and whether that, in and of itself, is a suspicious enough fact to prevent an inference of discrimination? It is not, Your Honor. The circumstances surrounding the issue is very clear. And it's reflected directly in the memorandum sent by Mr. Salas, the termination memorandum, that describes very specifically and very clearly what Allstate Financial's reasons were for the termination, which is essentially a loss of confidence, the appearance of impropriety that the fact that it appeared to the decision-makers that Ms. Garcia was covering up an issue that perhaps she did not know about in advance. That's not the issue. But why does a jury have to take that at face value in view of these other facts? I guess that it isn't that you didn't give her a reason. Of course you gave her a reason. But why couldn't a jury find that that is a pretextual reason? Because there's no ---- Your Honor, the standard is actually, and I'm sure you're aware of this, it's pretext for discrimination. There's no evidence that this is pretext for discrimination. You may agree with, you may disagree with the ultimate decision, but that's frankly neither for the district. Well, what we have is evidence, and remember, this is all summary judgment, so maybe none of this will turn out to be found by a jury if there were a trial. But there is evidence that 99 percent of the time management does what the investigator suggests. The investigator suggests doing nothing. So that's already like, well, why is this person in the 1 percent? There's significant evidence of discriminatory activities and attitudes by Mr. Smith, and there's at least potentially circumstantial evidence that Smith had some role in deciding whether she should stay or not stay. Well, I disagree with that last statement, Your Honor. There is no evidence that Mr. Smith had any role. And, Your Honor, if I may, what I'd like to do for a moment is go back to the separate statement, which was before the Court, and the separate statement, the statement submitted to the district court was, quote, Smith had no involvement in the decision to terminate Garcia's employment. This is undisputed fact number 35, to which Ms. Garcia did not dispute that before the district court. There was no response. She didn't dispute that issue. There is nothing in the record to indicate that Mr. Smith was involved in any way in the decision process. And the only evidence with regard to Mr. Smith, and I will, for the purposes of summary judgment, concede the existence of this evidence. Obviously, we disagree, but for summary judgment purposes, that's not relevant. That there is an incident that took place in 2000 with regard to the testimony is that Mr. Smith made fun of Ms. Garcia at a bowling event. That's the only evidence with regard to any sort of discriminatory animus with regard to Mr. Smith. That is insufficient to raise any evidence of pretext of discrimination when the evidence is overwhelming that Mr. Smith had nothing to do with the decision making. And even the cases out of this circuit that talk about when an individual has influence into the decision making process do not go so far as to say that the individual, there is no connection to the decision making process, which is the situation that we have here. A couple of other points that I'd like to touch on, Your Honors. With regard to the point that was raised as to differing treatment as to similarly situated individuals, males in this case, there is no evidence in the record that any male was treated differently than Ms. Garcia. The only evidence that ---- That's not required, though, to raise. I mean, it's one way to show pretext, but it's not a required way, is it? It is one way, Your Honor. But since this Court raised that as a question, I want to address it. There is no evidence, and as the district court properly found, there is no evidence that any similarly situated male was treated differently. There is no direct evidence here, and therefore, we have to be looking for specific and substantial circumstantial evidence, which, again, there is no such evidence. To address a point that was raised earlier as to the reason for the termination, the reason for the termination of the affiliation with the broker-dealer, that reason is set forth very specifically in the termination request that indicates the broker-dealer's reason for doing it, and at heart, it is a loss of confidence with regard to Ms. Garcia's actions. That is what led the broker-dealer to issue the U-5 and terminate her ability to basically be in the securities industry. To address the point that was raised with regard to, well, some sort of unknown individual at Allstate Financial, that's simply untrue. I will admit that you have to look a little bit carefully to sort of pull this out. And the record's not as clear as it should be. But the report, Mr. Yang's report, gets sent to Joe Rath. It's indicated on the face of that. Joe Rath, if you look further into the termination request with regard to Mr. Elliott and Ms. Revels, who were the other plaintiffs prior to stipulating to the dismissal, clearly indicates who Mr. Rath is. He is the assistant vice president of financial and the assistant general counsel of financial. There's no mystery as to how this gets to financial. It's sent directly to financial. Also, both the termination request and the termination memo, I'm sorry, the termination request and Mr. Yang's report both indicate that the investigation was initiated because Ron Roseborough, who is the regional financial services leader, in other words, he is the higher-up management at financial, received evidence, received a phone call from an agent with regard to the issue as to Mr. Adler's agency. That's what started this. It is not as the appellants say that it was indicated, that it was started somehow by Mr. Smith. It's absolutely untrue. The information went directly to financial, and that is in the record. And so we don't know who made that phone call, I guess. Actually, no, it is indicated. If you give me one moment, I can tell you it does reflect that. I believe his first name was Fred, and I just have forgotten his second name. But it is actually indicated on Mr. Yang's report who made the phone call to Mr. Roseborough. It was another agent, basically, if you want to say ratting out another agent of theirs saying, hey, are you aware of what's going on here? This did not come internally from Allstate, it came externally. The other point that I wanted to make on this is that Mr. Salas' termination memo also specifically indicates, it's on the last page, that there is concurrence from the regional financial services leader, Mr. Roseborough, at financial. There's no mystery here. I will concede that the record could have been a little bit more apparent in terms of what was presented, but it's all in the record and there's no mystery. And all appellants are doing is trying to concoct a story to avoid the irrefutable issue that Mr. Smith was not involved in the decision to terminate. And, in fact, I go back to this key point. In their reply to the separate statement, they conceded, or I should say Ms. Garcia conceded, that Mr. Smith was not involved in the decision-making process. Ms. Garcia also conceded that the decision was made to terminate her was made by Mr. Smith, had any animus towards her whatsoever. Those are the facts that were presented to the district court. Kennedy, are you going from a lack of objection to the statement of undisputed fact? Those were facts that were presented to the district court and were not disputed in the separate statement, and so they are deemed to be undisputed facts, undisputed material facts for consideration by the district court. If the Court has any further questions? I don't believe that we do. Thank you very much, Your Honors. Thank you. As a starting point, in the trial court, the counsel for Ms. Garcia objected to the statement saying that Allstate hadn't produced the information as to who had discharged her, and certainly the issue was raised that Allstate's version of events as to what has occurred and who discharged her and why was unworthy of credence, and that was raised with the trial court, and I think despite what you've heard in argument, there is an inconsistent story being told by Allstate that does lack credence. There is direct evidence. There is direct evidence that Mr. Smith was involved in this decision, and there is nothing in this record that indicates, nothing that's not double hearsay or you have to take by innuendo or some other means to indicate what happened at Allstate Financial and why, though there is evidence direct from Mr. Smith's own testimony that Allstate could direct Allstate Financial as to what to do and what to decide about licensing and employment issues, and that is in the record. And as I think all of you have alluded to, the trier of fact can believe or disbelieve this testimony. We think it's inconsistent. We think there's plenty of evidence that Ms. Garcia was decided because she was about to work for Mr. Smith, who had a history of discrimination and some directly towards her. He didn't want her there. They found a reason to get rid of her, and they did, and that it was as a result of discrimination, and that is a triable issue. And unless there are any other questions. I don't believe so. Thank you. Thank you. The case just argued is submitted, and thank you both for your arguments.
judges: Fletcher B. , Canby, Graber